Jon G. Shadinger Jr., Esq. (036232017)
Shadinger Law, LLC
2220 N. East Avenue
Vineland, NJ 08360
(609) 319-5399
js@shadingerlaw.com
*Attorney for Plaintiff, David Chiovari*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| DAVID CHIOVARI, an Individual,<br><br>Plaintiff,<br><br>vs.<br><br>VINELAND BOARD OF EDUCATION,<br><br>Defendant. | Case No. 1:26-cv-13744<br><br>**COMPLAINT** |

## Introduction

Plaintiff, DAVID CHIOVARI, an individual ("Plaintiff" or "Mr. Chiovari"), on his own behalf and on the behalf of all other similarly situated mobility impaired persons, hereby sues the Defendant, VINELAND BOARD OF EDUCATION ("Defendant" or the "District"), for injunctive relief, damages, attorney's fees, litigation expenses, and costs pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.* ("LAD").

## The Parties

1. Plaintiff, DAVID CHIOVARI, is an individual over eighteen years of age and is otherwise *sui juris*. Mr. Chiovari resides at 1401 Fela Drive, Vineland, NJ 08360.

2. Defendant, VINELAND BOARD OF EDUCATION, is the board of education that governs, owns, and/or operates the Vineland Public Schools, the public school district of the City of Vineland, Cumberland County, New Jersey. The District's administrative offices are located at 61 West Landis Avenue, Vineland, NJ 08360.

3. Defendant is a "public entity" within the meaning of Title II of the ADA, as a department, agency, special purpose district, or other instrumentality of a State or local government.[1] Upon information and belief, Defendant is also a recipient of federal financial assistance, and all of its operations are a "program or activity" within the meaning of Section 504.[2]

## Jurisdiction and Venue

4. Pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, this Court has been given original jurisdiction over actions which arise from the Defendant's violations of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and Section 504, 29 U.S.C. § 794.[3]

5. Jurisdiction over the state law claim vests with this Court pursuant to 28 U.S.C. § 1367.

6. Venue is properly located in the District of New Jersey pursuant to 28 U.S.C. § 1391(b) because the Defendant is located within this judicial district, the facilities which form the basis of this action are located within this judicial district, and the events giving rise to Plaintiff's claims occurred within this judicial district.

7. This action concerns the following facilities, each of which is owned and/or operated by the Defendant (together, the "Facilities"):

---

[1] 42 U.S.C. § 12131(1)(B); 28 C.F.R. § 35.104.
[2] 29 U.S.C. § 794(b)(2)(B).
[3] *See also* 28 U.S.C. §§ 2201 and 2202.

a. Vineland High School, comprising its South building, located at 2880 East Chestnut Avenue, and its North building, located at 3010 East Chestnut Avenue, Vineland, NJ 08361, together with their parking lots and its athletic facilities, including the gymnasium in which basketball games are held, the baseball, soccer, and practice fields, the track and field areas, and the tennis courts ("Vineland High School");

b. Gittone Stadium, the District's football and soccer stadium, located at 60 West Montrose Street, Vineland, NJ 08360, including its grandstand, bleachers, concession areas, restrooms, and parking areas ("Gittone Stadium"); and

c. The District's administrative building, known as the Landis Administrative Offices, located at 61 West Landis Avenue, Vineland, NJ 08360, at which the Defendant holds its public meetings, together with its parking areas and the routes connecting it to Gittone Stadium (the "Board of Education Building").

8. Plaintiff is an individual with disabilities as defined by and pursuant to the ADA and Section 504. Mr. Chiovari has degenerative disc disease of the lumbar spine, lumbar spinal stenosis with neurogenic claudication, and radiculopathy, and has undergone multiple lumbar spinal fusions and revisions; he therefore has a physical impairment that substantially limits many of his major life activities[4] including, but not limited to, walking, standing, sitting, bending, and lifting. Although Mr. Chiovari can, at times, stand on his own and walk for short distances, he requires the use of a walker and/or a motorized scooter to ambulate the vast majority of the time and cannot navigate stairs, steps, or other abrupt changes in level.

---

[4] As defined by 42 U.S.C. § 12102 and 28 C.F.R. § 35.108.

9. Mr. Chiovari is a "qualified individual with a disability" as he meets the essential eligibility requirements for the receipt of the services and the participation in the programs and activities provided by the Defendant – including its interscholastic athletic events, which are open to the public, and its public meetings.[5]

## Factual Background

10. Mr. Chiovari is a lifelong resident of Vineland, a graduate of Vineland High School, and a Vineland High School athlete (soccer, track and field) during his time as a student.

11. For many years, Mr. Chiovari served the City of Vineland as an electrical and fire inspector, and then the State of New Jersey as a construction official, until he was medically retired due to his disability. Through that work he is thoroughly familiar with the building codes and accessibility standards that govern public facilities, and he readily recognizes the barriers to access that the Defendant has left in place.

12. Mr. Chiovari and his wife have two young children, both of whom are students in the Vineland Public Schools and who will in turn attend Vineland High School; other members of his family have participated, and will participate, in Vineland High School athletics. As a Vineland resident, taxpayer, and parent of District students, Mr. Chiovari has a direct and continuing interest in the District's programs and activities – including its athletic events and the public meetings of its Board.

13. The Defendant's interscholastic athletic events are open to the public and are an important part of community life in Vineland. Mr. Chiovari seeks to attend those events on an equal basis with other spectators, alongside his family and his fellow residents. He enjoys watching

---

[5] 42 U.S.C. § 12131(2).

Vineland High School athletics of every kind because of his deep ties to the Vineland community. The events held at the Facilities include participants of all ages, not only high school students.

14. Mr. Chiovari's children currently participate in baseball, tennis, basketball, and soccer – on some occasions they have participated in events held at the Facilities. On those occasions, Mr. Chiovari has either been unable to attend or been precluded from watching with other spectators and family members. He sincerely hopes that by the time they reach Vineland High School the Facilities will be accessible to those with disabilities so that he may have the full enjoyment of watching them participate in their chosen sport.

**Vineland High School**

15. Since becoming disabled, Mr. Chiovari has attended Vineland High School basketball games in the gymnasium on many occasions. The gymnasium does not provide any wheelchair space within its spectator seating. At each such game, the District's personnel permitted Mr. Chiovari to remain in his motorized scooter only near the gymnasium's entry doors – apart from the other spectators and within the path of persons entering and exiting the gymnasium.

16. Since becoming disabled, Mr. Chiovari has attended Vineland High School games at the baseball and soccer complex on many occasions – including his nephew's games throughout the 2024–2025 season. The only route from the gated entrance to the fields and their bleachers is a flight of stairs; no ramp, elevator, or platform lift is provided. Because the stairs are impassable for Mr. Chiovari in his scooter and with his walker, he has had to watch the games from behind the fence, away from the bleachers, his family, and the other spectators.

17. Mr. Chiovari has been precluded from attending Vineland High School tennis matches as the courts are likewise reached only by stairs; no accessible route serves the courts. Further, Mr. Chiovari's child participates in tennis clinics and matches at this facility; his wife is

able to sit in the bleachers as a spectator while he is forced to view from his scooter in the adjacent upper parking lot while parked within the vehicular way.

18. Mr. Chiovari has been precluded from attending Vineland High School track and field events as those sporting areas are likewise served by no accessible route; the only route from the parking areas to the track is impeded by abrupt changes in level, excessive sloping, and vegetation, over a surface that is not firm, stable, or slip resistant. Further, as a former track athlete, Mr. Chiovari is precluded from taking his children to the public track area and participating in track and field activities.

19. Upon information and belief, the baseball and soccer field complex at Vineland High School was constructed on or after March 15, 2012; because construction commenced on or after that date, the baseball and soccer fields – including their spectator seating, team seating areas, and the routes serving them – were required to be designed and constructed to be readily accessible to and usable by individuals with disabilities, in compliance with the 2010 ADA Standards.[6]

20. The parking lots serving Vineland High School's North and South buildings lack the required number of accessible parking spaces – including a large parking lot in which no designated accessible space is provided at all – and the designated accessible spaces that do exist lack access aisles, are not identified by signs, are obstructed, and are poorly maintained, as further described in Paragraph 59.

**Gittone Stadium**

21. Gittone Stadium is the home of Vineland High School football and soccer. Each Thanksgiving Day, Vineland High School and Millville High School meet in one of the oldest high school football rivalries in the nation – first played in 1893 and contested 154 times – which

---

[6] 28 C.F.R. § 35.151(a)(1) and (c).

draws one of the largest crowds of the year. The site of the game alternates between the two schools; in recent years Vineland has hosted the game in even-numbered years, including 2024 and 2026.

22. Mr. Chiovari has attended several games a year at Gittone Stadium since he was a child and – most importantly to the present matter – since becoming disabled. In the past, he has been permitted to park in the designated accessible parking area inside the stadium gate, from which he was able to watch the game. Due to the fact that the stadium provides no wheelchair spaces in its seating, and the hill leading from the parking areas to the main bleachers is too steep for him to manage with a walker or for his motorized scooter to climb, parking inside the gate was the only way in which Mr. Chiovari could reasonably attend.

23. The designated accessible parking spaces serving Gittone Stadium are located within a lot that is enclosed by an iron fence and gates that can only be accessed from West Avenue; the spaces can be reached only when the gates are opened by the Defendant's security personnel. On game days, the gate is staffed by event security personnel, who are full-time employees of the Defendant. The lot's other gates, on Montrose Street, are permanently closed, so that no patron can enter or leave through them at any time, rendering the accessible parking spaces adjacent to those gates meaningless; the Defendant's security staff does not permit those spaces to be used at any time.

24. On several occasions during the 2024 fall soccer season, prior to October 25, 2024, the Defendant's security personnel refused Mr. Chiovari entry to the accessible parking area; he was forced either to leave without attending or to watch from his car, apart from his family.

25. On the evening of October 25, 2024, Mr. Chiovari arrived at Gittone Stadium with his wife and their two young children to watch his nephew play in the Vineland High School soccer

game and to attend the senior ceremony being held in his nephew's honor. His wife was driving, and Mr. Chiovari, who was in the passenger seat, displayed his disability parking placard.

26. At the gate to the accessible parking area, the Defendant's security employee told them that they could not enter and park in any of the designated accessible spaces – although accessible spaces inside the gate were open and available – and directed them instead to a lot behind them, which contained no accessible parking spaces at all.

27. While his wife parked the car, Mr. Chiovari got out and repeatedly asked the security employee why he could not park in one of the accessible spaces, or even in one of the open regular spaces, inside the gate. He explained that he wished to park there so that he could watch the game from that location, as he had in the past. He asked for a supervisor or anyone with greater authority with whom he could speak; the security employee told him that no one was available. When Mr. Chiovari told her that he would call the police and file a complaint unless she allowed him to park in an accessible space, she ignored him.

28. Mr. Chiovari was then forced to make his way from the lot to which he had been directed up the steep hill to the stadium with his walker and the assistance of his family; an arduous task which endangered his safety and caused him and his family great distress. On the way, he saw that other patrons' cars were parked in the accessible spaces inside the lot – including his own parents' car. A couple walking from one of those cars confirmed that they had been admitted through the very gate at which he had been turned away. When Mr. Chiovari reported these events to a second security employee, she simply ignored him and walked away.

29. Humiliated, and not wishing to make a scene in front of his family and the other spectators, Mr. Chiovari did not continue with any further public protestations. At approximately

5:50 p.m., he called the Vineland Police Department to report that he had been refused access to the accessible parking area.

30. During the game, a woman (who identified herself only as a District employee) approached Mr. Chiovari, told him the whole situation had been a misunderstanding, apologized, and told him that he could pull his car into the lot at any time. This illustrates the fact that the Defendant could readily have admitted Mr. Chiovari to its accessible parking from the outset, but its personnel simply refused to do so.

31. After the halftime events, Mr. Chiovari watched as the security employee opened the gate to allow other spectators to leave the lot. Unable emotionally to remain any longer, Mr. Chiovari left the game with his son to wait for the police.

32. The officer who took Mr. Chiovari's report did not arrive until more than an hour after his call. That officer documented that Mr. Chiovari had been denied access to an accessible parking space by a female school security employee, that the security employees are employed by Vineland Public Schools, and that Mr. Chiovari had been able to park there before but was denied this time; he was unable to locate the security employee, and the call was closed as a matter of record. Upon information and belief, neither the police nor the Defendant took any further action.

33. The refusal and the events that followed caused Mr. Chiovari emotional distress, mental anguish, humiliation, and dignitary harm. He had done nothing more than seek to park in a space designated for persons with disabilities so that he could attend his nephew's senior night soccer game – an evening he had looked forward to sharing with his family, and which the Defendant's actions ruined for him.

34. On event days – particularly the Thanksgiving Day game, given its large attendance – patrons with disabilities must at times park in the accessible parking spaces at the Board of

Education Building. The route from the front of the Board of Education Building to the stadium grounds is therefore the route Mr. Chiovari must travel to attend those events (as detailed below); that route is impeded by the barriers more specifically described in Paragraph 59.

35. Shortly thereafter, on November 28, 2024, Mr. Chiovari attended the Thanksgiving Day game at Gittone Stadium. Due to the large attendance, and lack of accessible parking spaces, Mr. Chiovari was forced to park in the designated accessible parking spaces in front of the Board of Education Building on Landis Avenue and then traverse a great distance in order to reach the stadium – an extremely taxing effort. This experience, again, caused him a great deal of mental anguish and emotional distress.

36. These previous encounters, coupled with his experiences on senior night and Thanksgiving, became more than he was willing to endure. Fearing further humiliation, physical and emotional stress, and retaliation from security personnel, Mr. Chiovari has been deterred from returning to Gittone Stadium for nearly two years.

**<u>The Board of Education Building</u>**

37. On or about November 4, 2024, Mr. Chiovari attempted to enter the Board of Education Building to discuss with District employees his experience, as described above, but struggled with the parking area and could not enter the building due to architectural barriers. Instead, he placed several phone calls, was put on hold, and then completely ignored.

38. The Board of Education Building is where the Defendant holds its public meetings, which are held monthly, on the first Wednesday of each month. As the parent of District students, Mr. Chiovari wishes to attend those meetings regularly, but is deterred from doing so by the barriers to access in the building's parking areas and exterior routes.

**Mr. Chiovari's Intent to Return**

39. Mr. Chiovari intends to return to each of the Facilities in the immediate future and on a recurring basis. He wishes to attend many future events, including, but not limited to, football and soccer games at Gittone Stadium (specifically, the football game against Millville on Thanksgiving Day, November 26, 2026); basketball games in the gymnasium; baseball games; tennis matches; track and field meets; swimming meets; school plays and other functions; and the Defendant's public meetings at the Board of Education Building, beginning with its meeting on November 4, 2026.

40. Mr. Chiovari's ties to the Facilities are concrete and enduring: he lives in Vineland, he is a graduate and former athlete of Vineland High School, his children attend the District's schools and participate in athletic endeavors that take place at the Facilities, and the Defendant's athletic events and public meetings are central to the life of his community. He will seek to attend these public events and meetings so long as he and his family remain a part of the community.

41. Mr. Chiovari has physically visited the Facilities and personally encountered architectural barriers and discriminatory policies and practices that have excluded him, segregated him from other spectators, and endangered his safety. He has actual notice of the barriers that remain, and he is deterred from fully and equally participating in the Defendant's programs and activities on account of them.

42. Mr. Chiovari has a realistic, credible, existing, and continuing threat of discrimination from the Defendant's non-compliance with the ADA, Section 504, and the LAD with respect to the Facilities as described, but not necessarily limited to the barriers he has personally encountered or observed – which are listed in Paragraph 59 of this complaint.

**The Defendant's Knowledge of the Barriers**

43. The barriers described herein are open, obvious, and longstanding. Section 504 has prohibited disability discrimination by recipients of federal financial assistance since 1973, and Title II of the ADA has prohibited disability discrimination by public entities since 1992.

44. The Defendant has long been required to evaluate its services, policies, and practices; to designate an employee to coordinate its compliance with Title II and adopt grievance procedures; and to develop a transition plan identifying the physical obstacles in its facilities that limit the accessibility of its programs and the methods and schedule by which they would be removed.[7] Upon information and belief, the Defendant has not removed the barriers to access described herein, and has failed to implement any transition plan that would do so.

45. The Defendant also had actual knowledge of the discrimination against Mr. Chiovari in particular, including the following:

a. On many occasions, the Defendant's personnel confined Mr. Chiovari to the area near the gymnasium entry doors, apart from the other spectators, because no wheelchair space was provided;

b. On several occasions during the 2024 fall soccer season, prior to the events of October 25, 2024 described below, the Defendant's security personnel refused him entry to the designated accessible parking area at Gittone Stadium, and he was forced either to leave or to watch from his car, apart from his family;

c. On October 25, 2024, two of the Defendant's security employees refused or ignored his requests for access to the accessible parking area – and the first refused his

---

[7] 28 C.F.R. §§ 35.105, 35.107, and 35.150(d).

request to speak with a supervisor – even as other patrons were admitted to the accessible spaces through the same gate;

d. Later that evening, a District employee acknowledged to Mr. Chiovari that he could have been admitted to the accessible parking area at any time; and

e. On or about November 4, 2024, when Mr. Chiovari attempted to raise the matter with the District – in person, where architectural barriers prevented him from entering the Board of Education Building, and by telephone – his efforts were ignored.

46. The Defendant's employees involved in each of these events had the authority to provide access and to correct the discrimination, yet the Defendant failed to do so. The Defendant's failure to act in the face of its knowledge that Mr. Chiovari's federally protected rights were being violated constitutes deliberate indifference, and its discrimination against him was therefore intentional.[8]

**<u>COUNT I</u>**
**Violation of Title II of the**
**Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.**

47. Plaintiff realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

48. Enacted by overwhelming bipartisan consensus in 1990, and reinforced with the same consensus in 2008, the ADA reflects Congress's recognition that "discrimination" has

---

[8] *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261–63 (3d Cir. 2013) (deliberate indifference satisfies the intentional discrimination required for compensatory damages under Section 504 and Title II); *Haberle v. Troxell*, 885 F.3d 170, 181 (3d Cir. 2018).

precluded "many people with physical or mental disabilities" from "fully participat[ing] in all aspects of society."[9]

49. Congress's objective was "the elimination or reduction of physical and social structures" that thwart "equal-citizenship stature for persons with disabilities."[10]

50. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[11]

51. The regulations implementing Title II prohibit a public entity from, among other things, denying a qualified individual with a disability the opportunity to participate in or benefit from its services; affording an opportunity that is not equal to that afforded others; providing different or separate services unless necessary to provide services as effective as those provided to others; and otherwise limiting a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others.[12] A public entity must administer its services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities,[13] and must make reasonable modifications in its policies, practices, and procedures when necessary to avoid discrimination on the basis of disability.[14]

52. A public entity may not deny the benefits of its services, programs, or activities to individuals with disabilities because its facilities are inaccessible to or unusable by them.[15] Each

---

[9] 42 U.S.C. § 12101(a)(1).
[10] *Tennessee v. Lane*, 541 U.S. 509, 535–36 (2004) (Ginsburg, J., concurring).
[11] 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130(a).
[12] 28 C.F.R. § 35.130(b)(1)(i)–(iv), (vii).
[13] 28 C.F.R. § 35.130(d).
[14] 28 C.F.R. § 35.130(b)(7)(i).
[15] 28 C.F.R. § 35.149.

service, program, or activity must be operated so that, when viewed in its entirety, it is readily accessible to and usable by individuals with disabilities.[16]

53. The Defendant's interscholastic athletic events – including its football, soccer, basketball, baseball, track and field, and tennis events – and its public meetings are services, programs, or activities of a public entity. When viewed in their entirety, they are not readily accessible to or usable by individuals with disabilities.

54. Further, each facility or part of a facility constructed by, on behalf of, or for the use of a public entity after January 26, 1992 must be readily accessible to and usable by individuals with disabilities, and each alteration made after that date must, to the maximum extent feasible, render the altered portion readily accessible to and usable by individuals with disabilities.[17] Construction and alterations commenced on or after March 15, 2012 must comply with the 2010 ADA Standards.[18] In stadiums, arenas, and grandstands, wheelchair spaces and companion seats must be dispersed to all levels that include seating served by an accessible route.[19]

55. The limited "safe harbor" afforded to unaltered elements of existing facilities does not apply to team or player seating or to the accessible route in court sports facilities; those elements must comply with the 2010 ADA Standards.[20]

56. A public entity must also maintain in operable working condition those features of its facilities that are required to be readily accessible to and usable by persons with disabilities.[21] The Defendant has failed to do so by, among other things, keeping the designated accessible

---

[16] 28 C.F.R. § 35.150(a).
[17] 28 C.F.R. § 35.151(a)(1) and (b)(1).
[18] 28 C.F.R. § 35.151(c)(3).
[19] 28 C.F.R. § 35.151(g).
[20] 28 C.F.R. § 35.150(b)(2)(ii)(L)(1) and (3) (team or player seating, Section 221.2.1.4; accessible route in court sports facilities, Section 206.2.12).
[21] 28 C.F.R. § 35.133(a).

parking serving Gittone Stadium behind locked gates, keeping the accessible spaces adjacent to the Montrose Street gates permanently unavailable, and refusing Mr. Chiovari entry to it, obstructing designated accessible parking at Vineland High School with traffic cones, and allowing the striping and markings of its accessible parking spaces to deteriorate.

57. The Defendant has discriminated against the Plaintiff, and other similarly situated mobility impaired persons, by excluding them from participation in, and denying them the benefits of, its services, programs, and activities; by segregating Mr. Chiovari from other spectators; by failing to make reasonable modifications in its policies, practices, and procedures – including by refusing Mr. Chiovari access to its designated accessible parking; and by failing to make its Facilities readily accessible to and usable by individuals with disabilities, as prohibited by the ADA.

58. A preliminary inspection of the Facilities, performed by Plaintiff's expert, has shown that violations of the ADA exist. Architectural barriers should be remediated so that those with disabilities may have full enjoyment of the Facilities. Barriers to access which are procedural in nature and/or policy based will need to be monitored into the future to ensure that the current discrimination is ceased and never reinstituted.

59. The following are architectural barriers and violations of the ADA that Mr. Chiovari has either personally encountered or observed during his visits to the Facilities, including barriers that precluded him from accessing certain areas and features of the Facilities:

**Vineland High School – Parking and Exterior Accessible Routes**

a. The parking provided at Vineland High School fails to provide a compliant accessible route from the parking areas to the entrances and/or accessible curb ramps; a violation of the ADAAG and Sections 402, 406, and 502 of the 2010 ADA

Standards, which require accessible routes to have a running slope no steeper than 1:20 (5%), a cross slope no steeper than 1:48 (2.08%), a clear width of at least 36 inches, and no vertical changes in level greater than ¼ inch (with changes between ¼ inch and ½ inch beveled no steeper than 1:2), and curb ramps to have a running slope no steeper than 1:12 (8.33%), flared sides no steeper than 1:10, and a level landing at least 36 inches long at the top. These conditions have presented Mr. Chiovari with a tipping/fall hazard when utilizing his scooter and/or walker.

b. The designated accessible parking spaces at Vineland High School lack access aisles for a majority of the accessible spaces – including the row of designated accessible spaces adjacent to the North building, none of which is served by an access aisle, and whose striping and symbols are faded – and contain slopes steeper than 1:48 (2.08%) and abrupt changes of level; further, no accessible parking spaces serve the track and field areas on the shortest accessible route to those areas; a violation of the ADAAG and Sections 208.3.1, 402, and 502 of the 2010 ADA Standards, which require accessible car spaces at least 96 inches wide (van spaces 132 inches wide, or 96 inches wide with a 96-inch access aisle), an access aisle at least 60 inches wide serving each accessible space, extending its full length and adjoining an accessible route, and parking spaces and access aisles with no slopes steeper than 1:48 (2.08%) in any direction. Without an access aisle Mr. Chiovari cannot safely exit and re-enter his vehicle with his walker or scooter.

c. The designated accessible parking spaces adjacent to the northeast entrance of the South building at Vineland High School are not identified by any vertical signs, are obstructed by traffic cones placed within the accessible parking area, and are not

located on the shortest accessible route to the building entrance, requiring travel across the vehicular drive aisle; a violation of the ADAAG and Sections 208.3.1, 216.5, 502.3, and 502.6 of the 2010 ADA Standards, which require each accessible parking space to be identified by a sign mounted at least 60 inches above the ground to the bottom of the sign, with van spaces designated "van accessible," access aisles to be marked so as to discourage parking in them, and accessible spaces to be located on the shortest accessible route to an accessible entrance. The obstruction of the accessible parking area is also a failure to maintain accessible features in violation of 28 C.F.R. § 35.133.

d. Vineland High School fails to provide the requisite number of compliant accessible parking spaces and van-accessible parking spaces in any of its existing lots – including in the large parking lot which serves the North building and is closest to the baseball, soccer, and practice fields, in which no designated accessible parking space is provided at all; a violation of the ADAAG and Sections 208 and 502 of the 2010 ADA Standards, which require the number of accessible parking spaces set by Table 208.2, calculated separately for each parking facility (one accessible space for 1–25 total spaces, two for 26–50, three for 51–75, four for 76–100, five for 101–150, six for 151–200, seven for 201–300, eight for 301–400, and nine for 401–500), with at least one of every six accessible spaces being van accessible, located on the shortest accessible route to an accessible entrance.

e. The exterior routes at Vineland High School contain steps and stairs, abrupt changes of level, and cross-sloping steeper than 1:48 (2.08%) – including the stairs that provide the only route from the parking areas and walkways to the baseball,

soccer, and practice fields and to the tennis courts – and no exterior accessible route serves the track and field areas; a violation of the ADAAG and Sections 303 and 402 of the 2010 ADA Standards, which require accessible routes to have a running slope no steeper than 1:20 (5%), a cross slope no steeper than 1:48 (2.08%), a clear width of at least 36 inches, and no vertical changes in level greater than ¼ inch (with changes between ¼ inch and ½ inch beveled no steeper than 1:2), and require changes in level greater than ½ inch along an accessible route to be ramped or served by an elevator or platform lift; stairs are not permitted as part of an accessible route.

f. Vineland High School fails to provide a continuous accessible route throughout the campus, including between the North and South buildings, their parking lots, and the athletic facilities; a violation of the ADAAG and Sections 206.2.2 and 402 of the 2010 ADA Standards, which require at least one accessible route to connect accessible buildings, accessible facilities, accessible elements, and accessible spaces on the same site, including each area of sport activity.

g. Vineland High School fails to provide a compliant accessible route from the adjacent streets, sidewalks, and public transportation stops; a violation of the ADAAG and Section 206.2.1 of the 2010 ADA Standards, which requires at least one accessible route within the site from public streets and sidewalks, public transportation stops, and accessible parking to an accessible building entrance.

**Vineland High School – Athletic Facilities and Spectator Seating**

h. Vineland High School fails to provide wheelchair spaces and companion seats in the spectator seating at the tennis courts, the baseball and soccer fields, the track

and field areas, and the gymnasium in which basketball games are held, integrated into and dispersed throughout the seating; in the gymnasium, Mr. Chiovari has been permitted to remain in his scooter only near the entry doors, apart from the other spectators and within the path of persons entering and exiting; a violation of the ADAAG and Sections 221.2.1.1, 221.2.2, 221.2.3, 221.3, 802, and 802.1.5 of the 2010 ADA Standards, which require assembly areas with fixed seating to provide the number of wheelchair spaces set by Table 221.2.1.1 (one for 4–25 seats, two for 26–50, four for 51–150, five for 151–300, six for 301–500, six plus one for each additional 150 seats or fraction thereof for 501–5,000, and 36 plus one for each additional 200 seats or fraction thereof for more than 5,000), each served by an accessible route and accompanied by a companion seat, integrated into the seating plan and dispersed so as to provide lines of sight and choices of seating locations substantially equivalent to those of other spectators; wheelchair spaces must be at least 36 inches wide (33 inches where two are adjacent) and 48 inches deep (60 inches where entered from the side), level, and must not overlap circulation paths.

i. The Vineland High School baseball, soccer, and practice fields – including their spectator seating and team seating areas – are completely inaccessible; the only route from the gated entrance to the baseball and soccer fields and their bleachers is a flight of stairs, no ramp, elevator, or platform lift is provided, and the practice fields are not served by any accessible route. The stairs are impassable for Mr. Chiovari both in his scooter and with his walker, and he has had to watch games from behind the fence. This is a violation of the ADAAG and Sections 206.2.2, 221.2.1.1, 221.2.1.4, 303, and 402 of the 2010 ADA Standards, which require an

accessible route to each area of sport activity, wheelchair spaces and companion seats in spectator seating as set forth above, at least one wheelchair space complying with Section 802.1 in team or player seating areas serving areas of sport activity, and changes in level greater than ½ inch along an accessible route to be ramped or served by an elevator or platform lift.

j. The Vineland High School tennis courts are completely inaccessible; the only route from the parking area to the courts is by stairs, and no accessible route serves the courts or connects both sides of each court. The stairs are impassable for Mr. Chiovari both in his scooter and with his walker. This is a violation of the ADAAG and Sections 206.2.2, 206.2.12, 303, and 402 of the 2010 ADA Standards, which require an accessible route to each area of sport activity, an accessible route directly connecting both sides of each court in court sports facilities without requiring a player to cross another court, and changes in level greater than ½ inch along an accessible route to be ramped or served by an elevator or platform lift.

k. The Vineland High School track and field areas – including their team or player seating areas – are completely inaccessible; the only route from the parking areas to the track is impeded by abrupt changes in level, excessive sloping, and vegetation, and its surface is not firm, stable, or slip resistant. No accessible route serves the track and field areas. This is a violation of the ADAAG and Sections 206.2.2, 221.2.1.4, 302, 303, and 402 of the 2010 ADA Standards, which require an accessible route to each area of sport activity; at least one wheelchair space complying with Section 802.1 in team or player seating areas serving areas of sport activity; floor and ground surfaces of accessible routes that are firm, stable, and slip

resistant; and accessible routes with a running slope no steeper than 1:20 (5%), a cross slope no steeper than 1:48 (2.08%), and no vertical changes in level greater than ¼ inch, with changes in level greater than ½ inch ramped or served by an elevator or platform lift.

**<u>Vineland High School – Entrances, Service Counters, and Restrooms</u>**

l. Entering Vineland High School is impeded by abrupt changes of level at the thresholds, improper door hardware, and/or excessive slopes at the base of the doors; a violation of the ADAAG and Section 404 of the 2010 ADA Standards, which requires a clear opening width of at least 32 inches, thresholds no higher than ½ inch (¾ inch for existing or altered thresholds, beveled no steeper than 1:2), hardware operable with one hand without tight grasping, pinching, or twisting of the wrist mounted 34 to 48 inches above the floor, and level maneuvering clearance on the pull side at least 60 inches deep with at least 18 inches beyond the latch side for a front approach.

m. The service counters at Vineland High School – including those serving athletic events – and other work surfaces are mounted beyond the reach of Mr. Chiovari; a violation of the ADAAG and Sections 308, 902, and 904 of the 2010 ADA Standards, which require operable parts to be located within 15 to 48 inches above the floor for an unobstructed reach, a portion of each sales and service counter at least 36 inches long to be no higher than 36 inches above the floor, and work surfaces to be 28 to 34 inches above the floor with knee clearance for a forward approach.

n. The restrooms at Vineland High School are inaccessible to Mr. Chiovari as they contain barriers to access including, but not limited to, incorrect signage, inaccessible water closets which lack proper controls, and an overall lack of maneuvering space; a violation of the ADAAG and Sections 601 and 603 of the 2010 ADA Standards, which require a turning space (a 60-inch diameter circle or a T-shaped space) within the room, doors that do not swing into the clear floor space of any fixture, mirrors with the bottom of the reflecting surface no higher than 40 inches above the floor where located above a lavatory, and tactile signage on the latch side of the door between 48 and 60 inches above the floor. Due to these barriers Mr. Chiovari could not safely make use of the restrooms.

o. On some occasions, portable toilet units have been provided at Vineland High School's outdoor athletic events. Mr. Chiovari reports that they are provided only intermittently, and that no accessible unit is provided when they are present; a violation of the ADAAG and Section 213.2 (including Exception 3) of the 2010 ADA Standards, which requires that, where portable toilet units are clustered at a single location, at least 5 percent of the units at each cluster comply with Section 603 and be identified by the International Symbol of Accessibility.

p. The restrooms at Vineland High School contain dispensers which are mounted beyond the reach of wheelchair users; lavatories which lack the required knee and toe clearance; grab bars which are improperly mounted; and water closets with improper centerlines; a violation of the ADAAG and Sections 308, 604, and 606 of the 2010 ADA Standards, which require dispensers and other operable parts to be mounted between 15 and 48 inches above the floor; the front of the lavatory rim or

counter to be no higher than 34 inches above the floor, with knee clearance at least 27 inches high and toe clearance at least 9 inches high beneath it and exposed pipes insulated; the water closet centerline to be 16 to 18 inches from the side wall or partition, with a clearance around the water closet at least 60 inches wide and 56 inches deep (59 inches for floor-mounted units) and a seat height of 17 to 19 inches; a side-wall grab bar at least 42 inches long located no more than 12 inches from the rear wall and extending at least 54 inches from it, and a rear-wall grab bar at least 36 inches long, mounted 33 to 36 inches above the floor; and flush controls on the open side of the water closet.

q. The use of the restroom doors at Vineland High School is impeded by improper signage and a lack of maneuvering clearance; a violation of the ADAAG and Section 404 of the 2010 ADA Standards, which requires level maneuvering clearance at the door – including at least 18 inches beyond the latch side on the pull side for a front approach – a clear opening width of at least 32 inches, and hardware operable without tight grasping, pinching, or twisting of the wrist mounted 34 to 48 inches above the floor.

**<u>Gittone Stadium and the Board of Education Building –</u>**

**<u>Parking and Exterior Accessible Routes</u>**

r. The designated accessible parking spaces serving Gittone Stadium are located within a lot behind the stadium that is enclosed by an iron fence and gates, so that they can be reached only when the gates are opened by the Defendant's personnel – who refused Mr. Chiovari entry on October 25, 2024 – and no vertical signs identify the accessible spaces within the lot; a violation of the ADAAG and

Sections 208.3.1, 216.5, and 502.6 of the 2010 ADA Standards, which require each accessible parking space to be identified by a sign mounted at least 60 inches above the ground to the bottom of the sign, with van spaces designated "van accessible," and accessible spaces to be located on the shortest accessible route to an accessible entrance; and a failure to maintain accessible features and to make reasonable modifications in policies, practices, and procedures, in violation of 28 C.F.R. §§ 35.133 and 35.130(b)(7).

s. The designated accessible parking at Gittone Stadium and the Board of Education Building lacks access aisles for a majority of the accessible spaces, contains slopes steeper than 1:48 (2.08%) and abrupt changes of level, and is poorly maintained – in the fenced lot behind the stadium and in the lot between the Board of Education Building and the stadium, the striping and symbols of the designated accessible spaces are badly faded, and at least one designated space is crossed by a cracked pavement seam; a violation of the ADAAG and Sections 302, 402, and 502 of the 2010 ADA Standards, which require accessible car spaces at least 96 inches wide (van spaces 132 inches wide, or 96 inches wide with a 96-inch access aisle), an access aisle at least 60 inches wide serving each accessible space, extending its full length and adjoining an accessible route, and parking spaces and access aisles with no slopes steeper than 1:48 (2.08%) in any direction.

t. Gittone Stadium and the Board of Education Building fail to provide the requisite number of compliant accessible parking spaces and van-accessible parking spaces; a violation of the ADAAG and Sections 208 and 502 of the 2010 ADA Standards, which require the number of accessible parking spaces set by Table 208.2,

calculated separately for each parking facility, with at least one of every six accessible spaces being van accessible, located on the shortest accessible route to an accessible entrance.

u. The parking provided at Gittone Stadium and the Board of Education Building fails to provide a compliant accessible route from the parking areas to the entrances and/or accessible curb ramps; a violation of the ADAAG and Sections 208.3.1, 402, 406, and 502 of the 2010 ADA Standards, which require accessible routes to have a running slope no steeper than 1:20 (5%), a cross slope no steeper than 1:48 (2.08%), a clear width of at least 36 inches, and no vertical changes in level greater than ¼ inch, and curb ramps to have a running slope no steeper than 1:12 (8.33%), flared sides no steeper than 1:10, and a level landing at least 36 inches long at the top.

v. Gittone Stadium and the Board of Education Building fail to provide a continuous accessible route throughout the site – including from the front of the Board of Education Building, and its accessible parking spaces, to the stadium gates, and from the gates to the seating, concession, and restroom areas of the stadium; a violation of the ADAAG and Sections 206.2.1, 206.2.2, and 402 of the 2010 ADA Standards, which require at least one accessible route from public streets and sidewalks, public transportation stops, and accessible parking to an accessible entrance, and at least one accessible route to connect accessible buildings, facilities, elements, and spaces on the same site, including each area of sport activity.

w. The long concrete ramp running along the stadium wall contains open, vegetated joints between its slabs and along its edges, meets the asphalt pavement at its base

with a cracked and uneven transition, and does not provide intermediate landings at the intervals required for its length; a violation of the ADAAG and Sections 302, 303, and 405 of the 2010 ADA Standards, which require ramps to have a running slope no steeper than 1:12 (8.33%), a cross slope no steeper than 1:48 (2.08%), a rise of no more than 30 inches for any ramp run, level landings at least 60 inches long at the top and bottom of each ramp run, and handrails on both sides of any ramp run with a rise greater than 6 inches.

x. The walkway along the side of the grandstand, leading from the gated rear parking area toward the field, has a running slope steeper than 1:20 without handrails or landings, and its surface contains open and displaced joints; and the exterior routes at the stadium contain abrupt changes of level and excessive cross slope – including the steps and raised lips at the ends of the tunnels leading from the rear of the grandstand to the seating, and the cross slope of the paved area in front of the concession windows; a violation of the ADAAG and Sections 303, 402, and 405 of the 2010 ADA Standards, which require accessible routes to have a running slope no steeper than 1:20 (5%) – or to comply as ramps – a cross slope no steeper than 1:48 (2.08%), and no vertical changes in level greater than ¼ inch, and require changes in level greater than ½ inch to be ramped or served by an elevator or platform lift.

**<u>Gittone Stadium – Spectator Seating, Entrances, and Service Counters</u>**

y. Gittone Stadium fails to provide wheelchair spaces and companion seats in either its grandstand or its bleachers, integrated into and dispersed throughout the seating; the grandstand seating is reached only by stairs from the walkway in front of it and

by tunnels that end in steps, the level walkway in front of the grandstand is closed off by stanchions and belts, and no wheelchair spaces are provided along the walkway serving the bleachers, which in any event is a circulation path; a violation of the ADAAG, 28 C.F.R. § 35.151(g), and Sections 221.2.1.1, 221.2.2, 221.2.3, 221.3, 802, and 802.1.5 of the 2010 ADA Standards, which require the number of wheelchair spaces set by Table 221.2.1.1 (six for 301–500 seats; six plus one for each additional 150 seats, or fraction thereof, for 501–5,000 seats; and 36 plus one for each additional 200 seats, or fraction thereof, for more than 5,000 seats), each served by an accessible route and accompanied by a companion seat, integrated into the seating plan and dispersed so as to provide lines of sight and choices of seating locations substantially equivalent to those of other spectators, and wheelchair spaces that are level and do not overlap circulation paths. Because of these barriers, Mr. Chiovari cannot watch a game at Gittone Stadium seated with his family and the other spectators.

z. Entering the Gittone Stadium seating and service areas, and the Board of Education Building, is impeded by abrupt changes of level, improper door hardware, and/or excessive slopes at the base of the doors – including the raised concrete sills at the doors of the stadium building, which exceed ½ inch in height; a violation of the ADAAG and Sections 303 and 404 of the 2010 ADA Standards, which require a clear opening width of at least 32 inches, thresholds no higher than ½ inch (¾ inch for existing or altered thresholds, beveled no steeper than 1:2), hardware operable with one hand without tight grasping, pinching, or twisting of the wrist mounted 34 to 48 inches above the floor, and level maneuvering clearance at the door.

aa. The service counters at Gittone Stadium – including the concession windows, whose counters exceed 36 inches above the ground – and other work surfaces are mounted beyond the reach of Mr. Chiovari; a violation of the ADAAG and Sections 308, 902, and 904 of the 2010 ADA Standards, which require operable parts to be located within 15 to 48 inches above the floor for an unobstructed reach, and a portion of each sales and service counter at least 36 inches long to be no higher than 36 inches above the floor.

**Gittone Stadium – Restrooms**

bb. The restrooms at Gittone Stadium are inaccessible to Mr. Chiovari as they contain barriers to access including, but not limited to, incorrect signage, inaccessible water closets which lack proper controls, and an overall lack of maneuvering space – including the absence of any wheelchair accessible toilet compartment, as the toilet compartments are standard-width stalls with in-swinging doors; a violation of the ADAAG and Sections 601, 603, and 604.8 of the 2010 ADA Standards, which require a turning space within the room, at least one wheelchair accessible toilet compartment at least 60 inches wide with a self-closing door that does not swing into the required clearance where toilet compartments are provided, and tactile signage on the latch side of the door between 48 and 60 inches above the floor.

cc. The restrooms at Gittone Stadium provide paper towel, soap, and toilet seat cover dispensers that are mounted beyond the reach of wheelchair users, and provide no toilet paper dispenser at the water closets, where rolls of toilet paper are instead stacked on the toilet tanks; a violation of the ADAAG and Sections 308 and 604.7 of the 2010 ADA Standards, which require dispensers and other operable parts to

be mounted between 15 and 48 inches above the floor, and a toilet paper dispenser located 7 to 9 inches in front of the water closet (measured to the centerline of the dispenser) with its outlet 15 to 48 inches above the floor.

dd. The lavatories at Gittone Stadium lack the required knee and toe clearance, their water supply and drain pipes are exposed and not insulated, and the space beneath them is used to store trash receptacles – a policy failure that also violates Section 305; a violation of the ADAAG and Sections 305 and 606 of the 2010 ADA Standards, which require a clear floor space positioned for a forward approach, the front of the lavatory rim or counter to be no higher than 34 inches above the floor, knee clearance at least 27 inches high and toe clearance at least 9 inches high beneath it, and exposed water supply and drain pipes to be insulated or otherwise configured to protect against contact. Due to these barriers Mr. Chiovari cannot approach the sinks to wash his hands.

ee. The water closets at Gittone Stadium lack grab bars and have improper centerlines; a violation of the ADAAG and Sections 604 and 609 of the 2010 ADA Standards, which require the water closet centerline to be 16 to 18 inches from the side wall or partition, a clearance around the water closet at least 60 inches wide and 56 inches deep (59 inches for floor-mounted units), a seat height of 17 to 19 inches, a side-wall grab bar at least 42 inches long located no more than 12 inches from the rear wall and extending at least 54 inches from it, a rear-wall grab bar at least 36 inches long, grab bars mounted 33 to 36 inches above the floor, and flush controls on the open side of the water closet. Due to these barriers Mr. Chiovari cannot safely use the toilets.

ff. The men's restroom at Gittone Stadium does not provide any urinal with a rim no higher than 17 inches above the floor; a violation of the ADAAG and Sections 213.3.3 and 605.2 of the 2010 ADA Standards, which require, where more than one urinal is provided, at least one urinal to be a stall-type or wall-hung urinal with the rim no higher than 17 inches above the floor.

gg. The use of the restroom doors at Gittone Stadium is impeded by raised sills, improper signage – the identification signs are mounted on the doors rather than on the wall at the latch side – and a lack of maneuvering clearance; a violation of the ADAAG and Sections 303, 404, and 703.4.2 of the 2010 ADA Standards, which require level maneuvering clearance at the door – including at least 18 inches beyond the latch side on the pull side for a front approach – thresholds no higher than ½ inch (¾ inch for existing or altered thresholds), and identification signs mounted on the wall at the latch side of the door.

60. Each of the foregoing violations is also a violation of the ADA Standards for Accessible Design, originally published on July 26, 1991 and republished as Appendix D to 28 C.F.R. part 36 ("1991 Standards"); the "2004 ADAAG," which refers to ADA Chapter 1, ADA Chapter 2, and Chapters 3 through 10 of the Americans with Disabilities Act and the Architectural Barriers Act Accessibility Guidelines, which were issued by the Access Board on July 23, 2004 and codified at 36 C.F.R. § 1191, appendix B and D ("ADAAG"); and the 2010 Standards for Accessible Design, which consist of the 2004 ADAAG and the requirements contained in 28 C.F.R. § 35.151 ("2010 ADA Standards"), as promulgated by the U.S. Department of Justice.[22]

[22] 28 C.F.R. § 35.104.

61. The discriminatory violations described in Paragraph 59 may not be an exhaustive list of the ADA violations that exist at the Facilities, but they are the result of a preliminary inspection and include those personally encountered or observed by Mr. Chiovari. Given the violations discovered and listed herein, the Plaintiff alleges, on information and belief, that there are other violations and barriers at the Facilities which relate to his disability. Thus, Plaintiff requires a thorough inspection of the Facilities in order to photograph and measure the architectural barriers which exist in violation of the ADA. Once said inspection has been completed, the Plaintiff may amend this complaint in order to provide proper notice to the Defendant regarding the full scope of this action.[23]

62. The ADA contains no "grandfather" provision. A facility's age bears only on which standard governs a given element, not on whether the ADA applies. The Defendant's obligation to make each of its services, programs, and activities readily accessible to and usable by individuals with disabilities applies to every one of its existing facilities, regardless of when it was constructed.[24]

63. Upon information and belief, the Facilities have been renovated and altered on numerous occasions since January 26, 1992 – including the installation of the artificial turf field, aluminum bleachers, and other renovations at Gittone Stadium in 2018, which were therefore required to comply with the 2010 ADA Standards – and each such alteration was required to be made readily accessible to and usable by individuals with disabilities to the maximum extent

---

[23] *See Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1047 (9th Cir. 2008) (holding that once a plaintiff encounters one barrier at a site, they can sue to have all barriers that relate to their disability removed regardless of whether or not they personally encountered them); *accord Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184 (2d Cir. 2013) (per curiam) (plaintiff who used a wheelchair had standing to challenge barriers at a restaurant related to his disability that he had not yet encountered); *Steger v. Franco, Inc.*, 228 F.3d 889 (8th Cir. 2000) (plaintiff who encountered a barrier had standing to challenge other barriers at the property related to his disability).

[24] 28 C.F.R. §§ 35.149 and 35.150(a).

feasible, and to provide an accessible path of travel to the altered area, including the restrooms and other elements serving it, to the extent the cost of doing so is not disproportionate to the cost of the overall alteration.[25] Discovery in this matter will reveal when such alterations took place and the corresponding technical and scoping specifications the Defendant must meet.

64. Plaintiff is not required to notify the Defendant of its violations of the ADA, nor of its ongoing discrimination, prior to the filing of this action.

65. Plaintiff, and other mobility impaired persons, will continue to suffer discrimination, injury, and damage without the immediate relief provided for by the ADA and requested herein.

66. Plaintiff is without adequate remedy at law and is suffering irreparable harm, including injury consisting of emotional distress, mental anguish, humiliation, and dignitary harm. Considering the balance of hardships between the Plaintiff and the Defendant, a remedy in equity is warranted. The public interest would not be disserved by the issuance of a permanent injunction.

67. The remedies, procedures, and rights set forth in Section 505 of the Rehabilitation Act are the remedies, procedures, and rights that Title II provides to any person alleging discrimination on the basis of disability.[26] Because the Defendant's discrimination against Mr. Chiovari was intentional, he is entitled to compensatory damages.

68. Pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 35.175, Plaintiff is entitled to recovery of attorney's fees, costs, and litigation expenses from the Defendant.

---

[25] 28 C.F.R. § 35.151(b)(1) and (b)(4).

[26] 42 U.S.C. § 12133 (incorporating 29 U.S.C. § 794a).

**WHEREFORE**, Plaintiff respectfully demands:

a. The Court issue a Declaratory Judgment determining that the Defendant is in violation of Title II of the ADA.

b. Injunctive relief against the Defendant including an order to (1) cure all ADA violations existing at the Facilities listed herein and those later found through discovery, within the next six months; (2) make its services, programs, and activities – including its athletic events and public meetings – readily accessible to and usable by individuals with disabilities, including by providing integrated and dispersed wheelchair spaces and companion seats at each of its athletic venues; (3) make reasonable modifications in its policies, practices, and procedures, including by ensuring that individuals with disabilities have access to its designated accessible parking at all times that the Facilities are open to the public; and (4) develop, publish, and implement a transition plan that complies with 28 C.F.R. § 35.150(d).

c. An Order requiring the Defendant to cease its discriminatory practices and to maintain the requisite accessible features at the Facilities – as required by the ADA.

d. An award of compensatory damages.

e. An award of attorney's fees, costs, and litigation expenses (including expert fees and costs) pursuant to 42 U.S.C. § 12205.

f. Such other relief as the Court deems just and proper and is allowable under Title II of the ADA.

**<u>COUNT II</u>**
**Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**

69. Plaintiff realleges and incorporates, by reference, all of the allegations contained in all of the preceding paragraphs.

70. Section 504 provides that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[27]

71. Upon information and belief, the Defendant receives federal financial assistance. The term "program or activity" includes all of the operations of a local educational agency,[28] and therefore encompasses each of the Defendant's schools, athletic facilities, athletic events, and public meetings.

72. The regulations implementing Section 504 further provide that no qualified person with a disability shall, because a recipient's facilities are inaccessible to or unusable by persons with disabilities, be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination under any program or activity to which the regulations apply.[29]

73. Claims under Section 504 and Title II of the ADA are governed by the same substantive standards.[30]

74. Mr. Chiovari is an individual with a disability and is otherwise qualified to attend the Defendant's athletic events and public meetings.

---

[27] 29 U.S.C. § 794(a).
[28] 29 U.S.C. § 794(b)(2)(B).
[29] 34 C.F.R. § 104.21; *see also* 34 C.F.R. §§ 104.4, 104.22, and 104.23.
[30] *S.H.*, 729 F.3d at 260.

75. As set forth above, the Defendant has excluded Mr. Chiovari from participation in, denied him the benefits of, and subjected him to discrimination under its programs and activities, solely by reason of his disability, in violation of Section 504.

76. The Defendant's discrimination against Mr. Chiovari was intentional, in that the Defendant acted with deliberate indifference to his federally protected rights.

77. Pursuant to 29 U.S.C. § 794a, Plaintiff is entitled to injunctive relief, compensatory damages, and an award of attorney's fees, costs, and litigation expenses.[31]

**WHEREFORE**, Plaintiff respectfully demands:

a. The Court issue a Declaratory Judgment determining that the Defendant is in violation of Section 504.

b. Injunctive relief against the Defendant including an order to cure all violations existing at the Facilities listed herein and those later found through discovery, and to make its programs and activities readily accessible to and usable by individuals with disabilities.

c. An award of compensatory damages, to the maximum extent permitted by law.

d. An award of attorney's fees, costs, and litigation expenses (including expert fees and costs) pursuant to 29 U.S.C. § 794a(b).

e. Such other relief as the Court deems just and proper and is allowable under Section 504.

---

[31] 29 U.S.C. § 794a(a)(2) and (b).

**COUNT III**
**Violation of New Jersey Law**
**Against Discrimination, N.J.S.A. 10:5-1 et seq.**

78. Plaintiff realleges and incorporates, by reference, all of the allegations contained in all of the preceding paragraphs.

79. Each of the Facilities is a place of public accommodation as defined by N.J.S.A. 10:5-5(l), which includes any "primary and secondary school," any "high school," any "educational institution under the supervision of the State Board of Education," and any "auditorium, meeting place, or hall."

80. New Jersey law provides that all persons shall have the opportunity to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation without discrimination on the basis of disability. This opportunity is recognized and declared to be a civil right.[32]

81. It is an unlawful discrimination for any owner, manager, agent, or employee of a place of public accommodation directly or indirectly to refuse, withhold from, or deny to any person any of the accommodations, advantages, facilities, or privileges thereof on account of that person's disability.[33]

82. As set forth above, the Defendant has violated the LAD by denying Mr. Chiovari, and all other mobility impaired persons, the full and equal enjoyment of the accommodations, advantages, facilities, and privileges of the Facilities – including by refusing him entry to its designated accessible parking areas and by segregating him from the other spectators at its athletic events.

[32] N.J.S.A. 10:5-4.
[33] N.J.S.A. 10:5-12(f)(1).

83. As a result of the aforementioned discrimination and his repeated exposure to architectural barriers and other harmful conditions, Mr. Chiovari has sustained injury through the Defendant's actions – either intentionally or negligently – in the form of emotional distress, mental anguish, humiliation, and dignitary harm, in violation of the LAD.

**WHEREFORE**, Plaintiff respectfully demands:

a. That this Court assume jurisdiction.

b. The Court issue a Declaratory Judgment determining that the Defendant is in violation of the LAD.

c. An injunction ordering the Defendant to immediately comply with the LAD by removing all architectural barriers listed herein or later found through discovery.

d. A monetary award consisting of the Plaintiff's compensatory damages, including damages for emotional distress, mental anguish, humiliation, and dignitary harm – to the maximum extent permitted – attorney's fees pursuant to N.J.S.A. 10:5-27.1, and litigation expenses, including expert fees and costs.

e. An order requiring the Defendant to cease its discriminatory practices and to maintain the requisite accessible features at the Facilities – as required by the LAD.

f. Other relief that this Court deems just and proper and is allowable under the LAD.

Respectfully submitted on this 22nd day of October 2026,

*/s/ Jon G. Shadinger Jr.*
Jon G. Shadinger Jr., Esq.
Shadinger Law, LLC
2220 N. East Avenue
Vineland, NJ 08360
(609) 319-5399
js@shadingerlaw.com
*Attorney for Plaintiff, David Chiovari*